97 A.3d 298

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Haleem L. LYLES, Appellant.**

Supreme Court of Pennsylvania.

Argued March 11, 2014.

Decided July 21, 2014.

---

Paul Joseph Hetznecker, Esq., for Haleem L. Lyles.

Hugh J. Burns, Jr., Esq., Michael Lee Erlich, Esq., Philadelphia District Attorney's Office, for Commonwealth of Pennsylvania.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.

## *OPINION*

Justice EAKIN.

This Court granted review to consider whether the Superior Court properly reversed the trial court's suppression of evidence, which was based on a finding that an officer's request for identification elevated an encounter to an investigative detention unsupported by reasonable suspicion. We affirm that reversal.

At about 4:30 p.m. on July 11, 2009, two officers on patrol in a marked police vehicle saw appellant and another male sitting on the steps of a vacant building in south Philadelphia. The officers approached the men to question their reason for loitering there, as a large number of burglaries had recently been reported in the area. Appellant stated his grandmother lived on the block. One officer asked for appellant's identification, which appellant gave him. When the officer began writing down the identification information, he saw appellant place his hand in his right pocket and turn his right side away from the officer's view; the officer told appellant to stop reaching and remove his hand. Appellant again put his hand in his right pocket. Concerned appellant might be reaching for a concealed weapon, the officer instructed him to remove his hand for the second time. When appellant reached into the pocket a third time, the officer placed appellant against the wall of the building to conduct a safety frisk for weapons. Appellant once again put his hand in the pocket, so the officer forcibly removed it, and a plastic bag containing blue packets filled with crack cocaine became visible. The officer handcuffed appellant and seized the plastic bag. The officer then

conducted a search incident to arrest and discovered a bag containing marijuana in appellant's left pocket.

Appellant was charged with possession with intent to deliver a controlled substance and possession of a controlled substance. He filed a motion to suppress the drugs, which the trial court granted. The court determined the issue was whether the officer's request for identification elevated the interaction from a mere encounter to an investigative detention. Suppression Court Opinion, 7/13/11, at 3. The court pointed out the officer testified at the suppression hearing he believed appellant was not free to leave while he was recording appellant's information. *Id.*, at 4 (citing N.T. Suppression Hearing, 3/15/11, at 13). Notwithstanding its understanding that an officer's subjective beliefs are immaterial to seizure determinations, the court found "the fact the officer in question did not believe [appellant] was free to leave [was] highly suggestive of the tenor of their encounter." *Id.* The court concluded the officer's request for identification indicated his dissatisfaction with appellant's explanation for his presence and signified "an intention to investigate further," leaving appellant "with no option to leave, unless he wished to leave his identification card behind[,]" and a reasonable person would not have felt free to ignore the request and leave the scene. *Id.* The court relied primarily upon the Superior Court's holding in *Commonwealth v. Au,* 986 A.2d 864 (Pa.Super.2009) (*en banc* ), *rev'd,* 615 Pa. 330, 42 A.3d 1002 (2012), where a mere encounter was held to escalate into an investigative detention upon an officer's request for identification. *Id.,* at 867. As a result, the suppression court held "the request of [appellant] for his identification elevated the encounter between him and [the officer] to an investigative detention unsupported by reasonable suspicion." Suppression Court Opinion, 7/13/11, at 6–7.

On appeal, a divided panel of the Superior Court reversed and remanded, the majority discussing this Court's reversal in *Au,* finding the officer's request was not escalatory and that the totality of the circumstances surrounding the interaction showed a mere encounter, not an investigative detention.

*Commonwealth v. Lyles,* 54 A.3d 76, 83–84 (Pa.Super.2012).[1] In *Au,* while on patrol after midnight, an officer observed a vehicle parked in the lot of a business which had closed hours earlier. Without activating his emergency lights, the officer positioned his patrol car to illuminate the vehicle with his headlights to see if its occupants needed assistance. The officer asked the youthful occupants why they were parked in the lot; one passenger responded they were "hanging out." The officer then requested each of the occupants' identification. When Au, the passenger, opened up the glove compartment to retrieve his identification, the officer saw two baggies of marijuana in plain view.

Au was charged, and his suppression motion was granted. A three judge panel of the Superior Court affirmed, as did an *en banc* panel, finding the encounter was transformed into an investigative detention upon the officer's request for identification. *Au,* at 867. The court noted the officer's "request for identification from all of the vehicle's occupants would have signaled to any reasonable person that the officer was unsatisfied with the response that the occupants were just hanging out, and that the officer wanted to investigate further"; therefore, an investigative detention occurred upon the request for identification and "no reasonable person would have felt free to terminate the encounter." *Id.* (citation omitted). This Court reversed, holding "the arresting officer's request for identification did not transform his encounter with [Au] into an unconstitutional investigatory detention[,]" *Commonwealth v. Au,* 615 Pa. 330, 42 A.3d 1002, 1009 (2012), and "a request for identification is not to be regarded as escalatory in terms of the coercive aspects of a police-citizen encounter[,]" *id.,* at 1007 (citation omitted).

Here, the Superior Court majority concluded the suppression court's finding that the interaction constituted a detention once the officer requested identification was precisely the escalatory extrapolation rejected by this Court in *Au. See*

1. Our reversal of the Superior Court in *Au* came after the suppression court's ruling but before the Superior Court's decision in the present case.

*Lyles,* at 82 ("A request for identification does not, by itself, transform a mere encounter into an investigative detention."). Noting the totality of the circumstances lacked coercion, intimidation, threats, excessive show of force, or any other circumstance indicating appellant was going to be detained, the majority recognized the only demand was for appellant to keep his hand out of his pocket. This did not substantially impair appellant's freedom of movement and was grounded in the officer's legitimate safety concerns. The majority also emphasized the suppression court's reliance on the officer's subjective belief was improper, as subjective beliefs are immaterial to an objective seizure determination. As a result, the majority concluded the totality of the circumstances failed to support a conclusion appellant had been seized.

Judge Strassburger concurred, aptly noting why subjective beliefs are not determinative: "When a police officer initiates an encounter, an individual as a practical matter *never* feels free to leave. . . . No responsible person would walk away from an encounter with a police officer. . . . [C]ase law does not comport with reality." *Id.,* at 84 (Strassburger, J., concurring) (emphasis in original). Judge Lazarus filed a dissenting opinion, concluding the officer conducted an unlawful detention unsupported by reasonable suspicion and no reasonable person would have felt free to leave under the totality of the circumstances. Judge Lazarus noted "an officer's request for identification alone cannot transform a mere encounter into an investigative detention," *id.,* at 85 (Lazarus, J., dissenting), but further stated:

> [I]n the circumstances here, where the officer is not satisfied with the citizen's verbal response, and not satisfied with merely looking at his identification, but goes on to write down the information, there is no doubt that the officer [was] engaging in an investigation. [The officer's] act of recording [appellant's] information was a show of authority, indicating that [appellant] was not free to leave.

*Id.* Judge Lazarus asserted the majority framed the issue in a way to make *Au* determinative and established "a bright-line rule that an officer's request for identification does not elevate

an encounter to an investigative detention[, an] approach [that] disregards both the totality of the circumstances test as well as the critical factual distinctions between *Au* and this case." *Id.*, at 86.

Article I, § 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution both protect the people from unreasonable searches and seizures. *Commonwealth v. Smith*, 575 Pa. 203, 836 A.2d 5, 10 (2003) (citation omitted). Jurisprudence arising under both charters has led to the development of three categories of interactions between citizens and police. *Id.* (citations omitted). The first, a "mere encounter," does not require any level of suspicion or carry any official compulsion to stop or respond. The second, an "investigative detention," permits the temporary detention of an individual if supported by reasonable suspicion. The third is an arrest or custodial detention, which must be supported by probable cause. *Id.* (citations omitted).

In evaluating the level of interaction, courts conduct an objective examination of the totality of the surrounding circumstances. *Commonwealth v. Strickler*, 563 Pa. 47, 757 A.2d 884, 889 (2000) (citations omitted). We are bound by the suppression court's factual findings, if supported by the record; however, the question presented—whether a seizure occurred—is a pure question of law subject to plenary review. *See Commonwealth v. Jones*, 605 Pa. 188, 988 A.2d 649, 654 (2010) (citations omitted).

The totality-of-the-circumstances test is ultimately centered on whether the suspect has in some way been restrained by physical force or show of coercive authority. *Strickler*, at 890 (citation omitted). Under this test, no single factor controls the ultimate conclusion as to whether a seizure occurred—to guide the inquiry, the United States Supreme Court and this Court have employed an objective test entailing a determination of whether a reasonable person would have felt free to leave or otherwise terminate the encounter. *Id.*, at 890 n. 8 (citation omitted). "[W]hat constitutes a restraint on liberty prompting a person to conclude that he is not free to

'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Michigan v. Chesternut,* 486 U.S. 567, 573–74, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988) (citations omitted).

This Court and the United States Supreme Court have repeatedly held a seizure does not occur where officers merely approach a person in public and question the individual or request to see identification. *See Hiibel v. Sixth Judicial District Court of Nevada,* 542 U.S. 177, 185, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004) (quoting *INS v. Delgado,* 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984)) (officer free to ask for identification without implicating Fourth Amendment, and requests for identification do not, by themselves, constitute seizures); *Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (citation omitted) (even when officers lack suspicion, no Fourth Amendment violation where they merely approach individuals on street to question them or request identification); *Au,* at 1007–09 (citations omitted) (same); *Commonwealth v. Ickes,* 582 Pa. 561, 873 A.2d 698, 701–02 (2005) (citation omitted) (same). Officers may request identification or question an individual "so long as the officers do not convey a message that compliance with their requests is required." *Bostick,* at 437, 111 S.Ct. 2382. Although police may request a person's identification, such individual still maintains " 'the right to ignore the police and go about his business.' " *See In re D.M.,* 566 Pa. 445, 781 A.2d 1161, 1164–65 (2001) (citations omitted) (quoting *Illinois v. Wardlow,* 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)).

Appellant argues the Superior Court incorrectly applied this Court's decision in *Au* and created a bright-line rule permitting officers to request identification from citizens without ever implicating the Fourth Amendment or Article I, § 8. The Commonwealth contends the Superior Court correctly applied *Au* and asserts the facts at hand are very similar but even less coercive than those in *Au.*

The Superior Court, guided by this Court's holding in *Au,* corrected the suppression court's reliance on since-reversed precedent of the case by removing the escalatory inference

from its assessment of the totality of the circumstances. *See Lyles,* at 82 ("This escalatory inference attributed to the act of requesting identification is precisely what our Supreme Court rejected in *Au.*"). We do not share the dissent's view that when the majority commented it was "constrained by *Au* to conclude that the lower court erred[,] ... [it] establish[ed] a bright-line rule that an officer's request for identification does not elevate an encounter to an investigative detention[.]" *See id.,* at 86 (Lazarus, J., dissenting) (internal citation and quotation marks omitted). Neither do we agree with appellant's contention that the decision created a bright-line rule that a request for identification from citizens can never implicate constitutional protections. All the Superior Court majority did was remove the escalatory inference and conduct an independent analysis of the totality of the circumstances:

> In the instant case, the interaction between [appellant] and the officers occurred in the afternoon, at 4:30 p.m. Though the police arrived in a marked vehicle, there was no evidence that they engaged their siren or lights. The two uniformed officers approached [appellant] and another individual and asked what they were doing in front of an abandoned building. After [appellant] responded that his grandmother lived nearby, [the officer] requested his identification. There was no credible evidence suggesting the officers engaged in intimidating movements or an overwhelming show of force. There was no evidence that either officer brandished a weapon. There was no evidence that the officers threatened any consequences for non-compliance with the request for identification, and the only demand made was that [appellant] was told to keep his hand out of his pocket while the officers were writing down the information on his identification. This minor inconvenience was not a substantial impairment on [appellant]'s liberty of movement, particularly considering the officers['] legitimate concerns for their own safety.

> \* \* \*

> [The officers] did not tell [appellant] that [he] was not free to leave, nor was there any credible evidence presented of

physical restraint. The officers did not draw their weapons or position themselves in a manner that obstructed [appellant]'s ability to walk away. Furthermore, as noted by the Commonwealth, [appellant] had voluntarily surrendered his identification, and there is no evidence that, in the few moments between the identification request and [appellant]'s engagement in furtive movements, [appellant] had requested that the identification be returned. The suppression court simply fails to demonstrate how the tenor of the encounter was inherently coercive absent the subjective belief of the officer, which is, by itself, an impermissible consideration.

[W]ithout the suppression court's inference that the request for identification escalated the encounter into one in which a reasonable person would not be free to leave, the totality of the circumstances presented in this case fail to support a conclusion that [appellant] had been seized.... [Appellant] and [the officer] were still engaged in a mere encounter, and not an investigative detention, when [the officer] requested [appellant]'s identification.

*Id.*, at 83–84.

 We find the Superior Court properly applied *Au*'s focused rationale and independently assessed the totality of the circumstances. *Au* holds that, in assessing the totality of the circumstances, a request for identification does not *in and of itself* elevate what would otherwise be a mere encounter into an investigative detention. *Au*'s limited premise is nothing new—it merely supported and reaffirmed well-settled principles allowing officers to request identification without any level of suspicion, and holding that a request alone does not constitute an investigative detention or seizure. *See Au*, at 1007 (citing *Hiibel*, at 185, 124 S.Ct. 2451; *Bostick*, at 434–35, 111 S.Ct. 2382; *Smith*, at 13; *Commonwealth v. Dowds*, 563 Pa. 377, 761 A.2d 1125, 1131 (2000)). Notwithstanding that general principle, an encounter involving a request for identification could rise to a detention when coupled with circumstances of restraint of liberty, physical force, show of authority, or some level of coercion beyond the officer's mere

employment, conveying a demand for compliance or that there will be tangible consequences from a refusal.

That is, *Au* does not, as appellant argues, create a bright-line rule that requests for identification never contribute to a detention analysis. *Au* simply holds there is no opposite bright-line rule that such requests automatically constitute detention. Although cases involving similar or comparable seizure determinations may serve as guideposts, a suppression court must independently employ the totality-of-the-circumstances test in determining whether a seizure occurred. Thus, we now turn to the facts in this case.[2]

■ Appellant argues the interaction constituted a seizure, contending the officer's request went beyond a mere encounter and amounted to an investigative detention. Appellant asserts a reasonable person would not feel free to terminate the encounter, noting two uniformed officers, with no knowledge of criminal activity in the area on that particular day, approached two young men in daylight, asked for their identity and reason for being there, and then, unsatisfied, commanded[3] appellant to produce identification. Appellant contends the officer's recordation on his notepad "establish[ed] beyond any question that he was ... presently under investigation[ ] and not engaged in a conversation that he could terminate at will." Appellant's Brief, at 24–25. Appellant further relies on the officer's trial testimony that he subjectively believed appellant was not free to leave while he was writing down the information. Appellant concludes the Superior Court's decision has "blurred the historic line of demarcation between the freedom of our citizens to move unencumbered[ ] and the police authority to intrude upon that liberty[,]" and he requests this Court clarify the law and the "line of demarcation"

2. The question herein turns on the request for identification and the recording of that information. Neither party challenges the constitutionality of events once appellant's furtive movements began.

3. Although appellant repeatedly advocates the officer "demanded" his identity and "commanded" him to produce identification, the suppression court determined the officer merely requested appellant's information, a finding of fact supported by the record. *See* Suppression Court Opinion, 7/13/11, at 1 (citation omitted).

by finding "a police officer[,] during a mere encounter, does not have the right to request identification from an individual without reasonable suspicion that criminal activity is afoot." *Id.*, at 26.

The Commonwealth asserts no seizure occurred, arguing appellant could have asked the officer to return his identification or declined to provide it to him in the first place. The Commonwealth contends the fact that the officer jotted down appellant's name and birth date on a notepad, as opposed to merely looking at the identification, should not elevate the encounter to an investigative detention because such a ruling would substantially impair police performance by forcing reliance on their memory. The Commonwealth argues the relevant constitutional question should not be whether appellant was "under investigation" but whether he was subject to an investigative detention constraining his freedom of movement.

We find the interaction did not escalate beyond a mere encounter. The officers knew the area was one where numerous burglaries had occurred, and if not that particular day, at least recently so. Seeing men sitting at a vacant building, there is no impropriety in the officers' approaching the men, nor in asking their reason for loitering there. The officer's request for identification, which came after appellant's response that his grandmother lived on the block, did not indicate "dissatisfaction" with the response—the relevance of this claim being unclear—nor did it objectively imply an intent to detain appellant beyond confirming who he was.

These were permissible acts that do not implicate the Fourth Amendment or Article I, § 8. Therefore, any "escalation" perceived by appellant or by the officer did not render the request objectively unconstitutional. The request was not accompanied by physical restraint, manifestation of authority, or a mandate to comply. The officer simply asked for appellant's identification; he did not demand it or require acquiescence, and appellant gave it to him voluntarily. The officer did not express dissatisfaction with appellant's reply or tell appellant he was not free to leave. There is no evidence appellant was confined or prevented from departing, or that

the officer impeded his movement in any way, as the interaction took place on a public street in broad daylight. There was no evidence the officer brandished a weapon or threatened appellant or that the interaction was *per se* coercive or intimidating. There is no record of the officer displaying an aggressive demeanor or using an authoritative tone suggesting there would be negative consequences if appellant failed to identify himself; he did nothing more than request appellant's identification. Had there been no repetitive furtive conduct by appellant, there is no reason to think the encounter would not have terminated promptly once the officer recorded the minimal information he requested.[4]

Moreover, we do not find the officer's brief recording of the card's information raised the encounter to an investigative detention.[5] Quickly jotting down the information, as opposed

4. As Judge Strassburger pointed out, most "responsible" members of society would never feel free to ignore police or terminate any encounter with them, regardless of context, whether their reason be morals, civility, or respect for the badge. However, the mere fact of being a police officer does not constitute coercion that rises to the level of constitutional impropriety. Regardless of a responsible person's perception, it is conduct and circumstance beyond the officer's inherent authority that converts an interaction into more than a mere encounter.

Although the reasonable person test may not always be empirically satisfying, the standard, which evolved from cases following *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), was designed as a means to determine whether a seizure occurred, in circumstances apart from those involving physical restraint. *See United States v. Mendenhall*, 446 U.S. 544, 553–54, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (citations omitted); *Chesternut*, at 573–74, 108 S.Ct. 1975 (citations omitted); *Delgado*, at 215–17, 104 S.Ct. 1758 (citations omitted). The test to determine whether a seizure occurred has nonetheless remained the same, and the ultimate inquiry hinges on whether an officer "has in some way restrained the liberty of a citizen[.]" *Terry*, at 19 n. 16, 88 S.Ct. 1868.

5. Appellant relies on both Judge Lazarus's dissent and the suppression court's finding the officer's writing signified intent to "investigate." Even if the officer's writing qualified as an "investigation," it is of no import to the instant seizure inquiry. All gathering of information by police could be characterized as "investigative"—the routine of an officer, on routine patrol, observing conduct suspicious or otherwise, acting on tips or radio directives, working open cases, or merely keeping eyes open, involves investigating in its broadest sense. Whatever its purpose, it is "detention" that is the focus, not whether it is

to attempting to memorize it, did not restrain appellant's freedom of movement. The officer did not question appellant further while he was holding the identification, and he did not use appellant's information to run a background check. He took no additional steps that would suggest detention or restrict appellant's freedom of movement. What delayed this interaction was not the officer's writing but appellant's worrisome refusal to keep his hands in sight.

The officer testified that as soon as he began writing appellant's name and date of birth, appellant's furtive movements began.[6] The entire interaction to this point lasted about a minute. For the reasons set forth, we conclude the interaction was a mere encounter and did not rise to a level of an investigatory detention. Accordingly, we affirm the Superior Court's order reversing the suppression of evidence and remanding for further proceedings.

Order affirmed. Jurisdiction relinquished.

Chief Justice CASTILLE and Justices McCAFFERY and STEVENS join the opinion.

Justice SAYLOR files a dissenting opinion in which Justices BAER and TODD join.

Justice SAYLOR, dissenting.

I respectfully dissent, since I find the exclusionary ruling of the suppression court to be supported by the record, viewed in the light most favorable to Appellant, and free from legal error.

arguably part of an investigation—one need not detain at all to investigate.

6. Although he also testified he believed appellant was not free to leave while he was recording the information, this was not affirmatively expressed to appellant. And as noted, the officer's subjective views are as immaterial to the objective standard as are appellant's. *See Commonwealth v. Lagana*, 517 Pa. 371, 537 A.2d 1351, 1355 n. 4 (1988) (citation omitted) ("The test of when a person is arrested is an objective one and depends upon the reasonable impression conveyed to the person seized and not the subjective view of the officers or the person being seized.").

Preliminarily, I differ with the majority's portrayal of the question of whether a seizure has occurred as a pure question of law. *See* Majority Opinion at 349–52, 97 A.3d at 302–03 (citing *Commonwealth v. Jones*, 605 Pa. 188, 197–98, 988 A.2d 649, 654 (2010)). Rather, I agree with those courts which have concluded that, "the question of when a person is seized for Fourth Amendment purposes is a mixed question of fact and law." *United States v. Goddard*, 491 F.3d 457, 465 (D.C.Cir. 2007); *accord State v. Courchesne*, 296 Conn. 622, 998 A.2d 1, 23 (2010) (citation omitted). The *Jones* case upon which the majority relies does not say any differently, as it was focused entirely on a discrete suppression challenge turning upon "allegations of legal error." *Jones*, 605 Pa. at 198, 988 A.2d at 654.

In any event, appropriate appellate review of a suppression ruling entails a determination whether the record supports the suppression court's factual findings and whether that court's findings are free from legal error. *See In re L.J.*, 622 Pa. 126, 136–38, 79 A.3d 1073, 1079–80 (2013) (setting forth the general appellate-level standard of review relative to suppression rulings). Significantly, relative to the facts, the record is to be read in a light most favorable to the prevailing party, here, Appellant. *See, e.g., Commonwealth v. Worthy*, 598 Pa. 470, 477, 957 A.2d 720, 724 (2008); *Commonwealth v. Robinson*, 518 Pa. 156, 159, 541 A.2d 1387, 1388–89 (1988); *In re Wilks*, 418 Pa.Super. 73, 76, 613 A.2d 577, 578 (1992).

In my view, assessed in the light most favorable to Appellant, the record in this case plainly supports the suppression court's determination that Appellant was seized. Indeed, the arresting officer provided credited testimony at the suppression hearing that he had, in fact, "stop[ed]" Appellant before Appellant began making the furtive gestures which led to the discovery of incriminating evidence. N.T., March 15, 2011, at 6. On cross-examination, the officer elaborated as follows:

Q. What you observed is two males standing there in front of a property; is that correct?

A. On the steps . . . .

Q. Based on that, *you decided to stop them; is that correct?*

A. *Yes,* to find out who they were and why they were on the steps of that property.

Q. When you got out of your vehicle, you approached my client and Mr. Meadows, was it; is that correct?

A. Yes.

Q. You immediately told them that you wanted identification; correct?

A. After asking why they were on the steps of the property, I proceeded to ask them what their name was.

Q. *They weren't free to leave, though, were they?*

A. *Well, while I was writing down their information, no.*

*Id.* at 12–13 (emphasis added).

The majority categorizes the officer's statement that Appellant was not free to leave as a subjective one, *see* Majority Opinion at 357 n. 6, 97 A.3d at 307 n. 6, albeit it was related in objective terms.[1] From my point of view, however, the officer's testimony that he stopped Appellant, that he took possession of Appellant's identification card, and that Appellant was not free to leave at such time is manifestly sufficient to support a determination that a reasonable person would have felt restrained, in the circumstances.

The decision in *Commonwealth v. Au,* 615 Pa. 330, 42 A.3d 1002 (2012), expressed reservations about the application of the governing standard—whether a reasonable person would have felt free to leave—on the terms on which such standard has evolved in the Fourth Amendment jurisprudence of the United States Supreme Court. In this regard, *Au* explained:

We recognize the conceptual difficulties inherent in the administration of the reasonable-person standard. Al-

1. There is some justification for the majority's approach arising from the record, since the suppression court also treated the testimony as expressing only a subjective viewpoint. *See Commonwealth v. Lyles,* No. CP–51–CR–0009421–2009, *slip op.* at 4 (C.P. Phila. July 13, 2011). Nevertheless, the suppression court added that "the fact the officer in question did not believe Appellee was free to leave is highly suggestive of the tenor of the encounter." *Id.*

though the test is cast in objective terms, absent empirical proofs, there remains substantial room for reasonable disagreement concerning how such a hypothetical person might feel in any given set of circumstances. Such differences have been manifested, at both the federal and state level, in many divided opinions on the subject. *See, e.g., Florida v. Royer*, 460 U.S. 491 [103 S.Ct. 1319, 75 L.Ed.2d 229] (1983) (plurality); *[United States v.] Mendenhall*, 446 U.S. [544,] 100 S.Ct. [1870, 64 L.Ed.2d 497 (1980) ] (plurality); *Commonwealth v. Boswell*, 554 Pa. 275, 721 A.2d 336 (1998) (equally divided Court).[fn] Nevertheless, the High Court has settled on an approach allocating very modest weight to the possibility for psychological coercion arising from a fairly wide range of police conduct which may be regarded as being appropriate to and inherent in the circumstances facilitating the interaction. *Cf.* WAYNE R. LaFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 9.4(a), at 425 (4th ed.2004) (observing that "the confrontation is a seizure only if the officer adds to those inherent pressures by engaging in conduct significantly beyond that accepted in social intercourse[,]" which include moral and instinctive pressures to cooperate).

---

[fn] The contraposition to the prevailing view also has been developed at length in many dissenting opinions in the United States Supreme Court and in this Court. *See, e.g., [Florida v.] Bostick*, 501 U.S. [429,] 450, 111 S.Ct. [2382,] 2394–95 [115 L.Ed.2d 389 (1991) ] (Marshall, J., dissenting) (describing an "aura of coercion and intimidation that pervades" police-citizen encounters during drug interdiction operations on passenger busses); *[Commonwealth v.] Smith*, 575 Pa. [203,] 226–27, 836 A.2d [5,] 19 [ (2003) ] (Nigro, J., dissenting) (taking the position that "police officers inherently display their authority and are intimidating solely by virtue of their position"); *[Commonwealth v.] Dowds*, 563 Pa. [377,] 389–90, 761 A.2d [1125,] 1132 [ (2000) ] (Nigro, J., dissenting) ("From the moment the police approach a person and identify themselves, the average citizen is, in my view, seized because he or she does not feel free to ignore the police officers and go about their business."). *See generally* David K. Kessler, *Free to Leave? An Empirical Look at the Fourth Amendment's Seizure Standard*, 99 J. CRIM. L. & CRIMINOLOGY 51, 87 (2009) (positing that empirical data shows that the Supreme Court has been determining that "people who do not in fact feel free to leave are free to leave"); David T. McTaggart, *Reciprocity on the Streets: Reflections on the*

*Fourth Amendment and the Duty to Cooperate with the Police*, 76 N.Y.U. L. Rᴇᴠ. 1233, 1249 (2001) ("Under the 'free to leave' standard, ... the standard of permissible intimidation is quite high.... The inevitable consequence of such a high standard is that many 'reasonable people' will be intimidated by, and submit to, police who lack any suspicion whatsoever, yet their submission will be regarded as consensual, and not as a seizure.").

*Id.* at 338–39 & n. 4, 42 A.3d at 1007–08 & n. 4 (alterations adjusted).

Despite the circumspection reflected in *Au*, in view of the precedent set by the Supreme Court of the United States, the *Au* majority found that it was obliged to apply its direction, for purposes of Fourth Amendment law, that a mere request from a law enforcement officer of a citizen for identification does not convert what otherwise is a mere encounter into a seizure. *See id.* at 338, 42 A.3d at 1007. To my knowledge, however, the U.S. Supreme Court has never held that no seizure occurs where an officer stops a citizen, takes possession of an identification card, and later explains that the citizen was not free to leave in the circumstances.

For this reason, and viewing the record in the light most favorable to Appellant as the successful party at the suppression stage, I believe the suppression court was free to recognize the prevailing reality in the present circumstances. Accordingly, I would reverse the Superior Court's decision to overturn the suppression ruling.

Justices BAER and TODD join this dissenting opinion.